IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ANDREW SCOTT WALLACE,

Defendant.

CRIMINAL ACTION NO.
1:12-CR-00230-TWT-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

This matter is presently before the Court on Defendant Andrew Scott Wallace's ("Defendant") Motion to Suppress Evidence, Motion to Adopt Co-Defendant Tolbert's Reply to Government's First Response to Defendants' Motion to Suppress Evidence, and Amended Motion to Suppress Evidence and Motion for Return of Property. Docket Entries [38, 46, 53]. For the reasons set forth below, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence and Amended Motion to Suppress Evidence be **GRANTED IN PART AND DENIED IN PART**. Docket Entries [38, 53]. Specifically, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence and Amended Motion to Suppress Evidence be **GRANTED** with respect to evidence obtained from the search of Defendant's cellular telephone and be **DENIED** with respect to evidence obtained from the search of Defendant's luggage and Galaxy tablet. The undersigned also **RECOMMENDS** that Defendant's Motion for

Return of Property be **DENIED**. Docket Entry [53]. The undersigned **DENIES AS MOOT** Defendant's Motion to Adopt Co-Defendant Tolbert's Reply to Government's First Response to Defendants' Motion to Suppress Evidence. Docket Entry [46].

### MOTION TO ADOPT CO-DEFENDANT TOLBERT'S REPLY TO GOVERNMENT'S FIRST RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS EVIDENCE

Defendant Wallace filed a Motion to Adopt Co-Defendant Tolbert's Reply to Government's First Response to Defendants' Motion to Suppress Evidence. Therein, Defendant asks to adopt his co-Defendant's brief about the necessity of an evidentiary hearing to develop the facts and circumstances related to the searches of his and his co-Defendant's luggage at Hartsfield-Jackson Atlanta International Airport ("Hartsfield airport") on July 1, 2012. Less than one week after Defendant filed his motion, the undersigned held an evidentiary hearing, during which the factual record regarding the July 1, 2012 search of Defendant's luggage at Hartsfield airport was developed. As such, the undersigned **DENIES AS MOOT** Defendant's Motion to Adopt Co-Defendant Tolbert's Reply to Government's First Response to Defendants' Motion to Suppress Evidence.

### MOTION AND AMENDED MOTION TO SUPPRESS EVIDENCE

I.     BACKGROUND

On July 2, 2012, Defendant Wallace was brought before this Court on a criminal complaint charging him and a co-Defendant with importing and attempting to import cocaine into the United States and possessing, with the intent to distribute, cocaine.

2

Docket Entry [1].  Later, on July 25, 2012, a federal grand jury returned a four-count indictment charging Defendant Wallace and a co-Defendant with conspiracy to knowingly import and attempt to import at least 500 grams of cocaine into the United States, conspiracy to knowingly and intentionally possess, with the intent to distribute, at least 500 grams of cocaine, knowingly and intentionally importing or attempting to import at least 500 grams of cocaine into the United States, and knowingly and intentionally possessing, with the intent to distribute, at least 500 grams of cocaine. Docket Entry [22].

A.   **Defendant Arrives at Hartsfield Airport**

On July 1, 2012, Defendant arrived at Hartsfield airport on a flight originating from San Jose, Costa Rica.[1] (October 4, 2012 Suppression Hearing Transcript ("Tr."), Docket Entry [50], 8).  Defendant's final destination was Baltimore, Maryland. (Tr. 8). After Defendant passed through an initial  immigration checkpoint, he retrieved his luggage from baggage carousel number two. (Tr. 25-27).  Defendant then walked towards the exit control area.[2] (Tr. 25-26).  Prior to reaching exit control, Customs and Border Protection ("CBP") Officer Christopher Regas approached Defendant. (Tr. 25-

---

[1] Although not relevant for purposes of this motion, Defendant was accompanied by co-Defendant Laurie Anne Tolbert.

[2] The exit control area is the final stop before a traveler gains admittance into the United States. (Tr. 27-28, 48).  Customs officers at exit control may ask the traveler questions, refer the traveler to the secondary baggage inspection area, agriculture, or back to immigration if they believe the traveler should not be admitted into the United States, or they may allow the traveler to continue on his or her way. (Tr. 28, 48).

3

26).  Although Officer Regas did not see Defendant disembark the airplane (Tr. 39), Officer Regas had been observing Defendant while he was claiming his luggage.  (Tr. 25-26).  Officer Regas did not witness Defendant engaging in any illegal activity.  (Tr. 39).  Instead, Officer Regas had been made aware that a lookout had been placed on Defendant.  (Tr. 29-30).  The Department of Homeland Security placed the lookout on Defendant as a result of an ongoing investigation regarding a package of narcotics in Baltimore, Maryland.  (July 6, 2012 Preliminary and Detention Hearing Transcript, Docket Entry [21], 9-10).  As part of the lookout, Officer Regas was given a photo of Defendant.  (Tr. 49).

Officer Regas was armed, but his weapon remained holstered as he approached Defendant.  (Tr. 46, 55).  Officer Regas stopped Defendant and asked him for his passport and customs form.  (Tr. 26).  Officer Regas also asked Defendant about the purpose of his travel and where he was heading.  (Tr. 26, 51).  Nothing stood out to Officer Regas about Defendant's responses to his questions.  (Tr. 51).  However, Defendant appeared to be "a little shocked that he had been stopped."  (Tr. 51).  After Defendant answered Officer Regas's questions, Officer Regas asked Defendant to accompany him to the baggage secondary inspection area.  (Tr. 26).  According to Officer Regas, CBP Officers Shana Wells and David Wolfe, who were waiting in the vicinity as Officer Regas approached Defendant, followed him and Defendant to the baggage secondary inspection area.  (Tr. 32-33, 49-50).  Officers Wells and Wolfe were armed, but their weapons remained holstered.  (Tr. 55, 68-69, 95).

4

**B.**   **Search of Defendant's Possessions**

Once in the baggage secondary inspection area, Officer Regas escorted Defendant to an inspection conveyor belt. (Tr. 33-34). Defendant placed his bags on the inspection belt at Officer Regas's request. (Tr. 34). Officer Regas and Defendant stood across from one another on opposite sides of the inspection belt. (Tr. 34). Officer Regas asked Defendant if the bags belonged to him. (Tr. 13, 34). Defendant answered "yes." (Tr. 13, 34). Officer Regas asked Defendant if he had packed the bags himself. (Tr. 13, 34). Defendant answered "yes." (Tr. 13, 34). Officer Regas asked Defendant if he was carrying anything for anyone else. (Tr. 13, 34). Defendant answered "no." (Tr. 13, 34). Officer Regas asked Defendant if anyone had asked him to carry anything into the United States. (Tr. 34). Defendant answered "no." (Tr. 34). Officer Regas asked Defendant if he took full responsibility for everything in the bags. (Tr. 13, 34). Defendant answered "yes." (Tr. 13, 34).

At that point, Officer Regas went to unzip Defendant's bags and noticed that the zippers had been zip-tied shut. (Tr. 13, 34-35). Officer Regas asked Defendant if he had placed the zip ties on his bags, and he confirmed that he did. (Tr. 13, 35). Officer Regas then proceeded to cut the zip ties off Defendant's bags without asking Defendant's permission to do so. (Tr. 35). With the zip ties removed, Officer Regas inspected Defendant's bags. (Tr. 35). In searching through a small, "briefcase computer bag" stored in one of Defendant's main bags, Officer Regas discovered two vacuum-sealed bags with what appeared to be baby powder, shampoo, women's shaving gel, and

5

suntan oil. (Tr. 13-14, 35). Officer Regas also discovered a vacuum-sealed bag of fifty dollar bills totaling more than $2,000. (Tr. 20, 35, 46).

Officer Regas cut open one of the vacuum-sealed bags of toiletries and attempted to take the cap off one of the bottles. (Tr. 14). Officer Regas found the cap was glued shut. (Tr. 14). Officer Regas also noticed that when he shook one or two of the bottles, it sounded like fertilizer in a plastic bottle rather than liquid. (Tr. 14-15). As a result, Officer Regas probed one of the plastic bottles and discovered a white powdery substance. (Tr. 14). Officer Regas field tested the white powdery substance, and it tested positive for cocaine. (Tr. 15). At some point, the items in the two vacuum-sealed bags were x-rayed. (Tr. 15). Officer Regas observed that several of the bottles contained "some type of granule substance." (Tr. 15-16).

After the cocaine was discovered, Defendant was placed under arrest. (Tr. 17). Officer Regas seized the cocaine, the vacuum-sealed bag of money, and Defendant's cellular telephone and Galaxy tablet. (Tr. 17). Officer Wolfe inspected the telephone and tablet. (Tr. 87, 89). Defendant's telephone was locked by a pass code. (Tr. 89). Officer Wolfe recalled asking Defendant for the pass code.[3] (Tr. 89). Officer Wolfe then inspected Defendant's telephone, which included looking through the telephone for telephone numbers, recent calls, text messages, and contacts. (Tr. 88). Officer Wolfe made a record of the telephone numbers he saw when he searched Defendant's

---

[3] Based on a review of an audio recording provided in discovery, Defendant clarifies that Officer Wolfe actually stated, "Real quick, I need you to just unlock that phone." (Def.'s Am. Mot. to Suppress, Docket Entry [53], 4).

6

telephone. (Tr. 88). Officer Wolfe also searched Defendant's tablet device. (Tr. 89). The tablet was not locked by a pass code. (Tr. 89). Upon completing the examination, Office Wolfe returned Defendant's telephone and tablet to the seizure process room. (Tr. 89-90). Officer Wolfe was unable to extract any files from Defendant's telephone or tablet device, although he tried. (Tr. 90).

Officer Regas placed Defendant's tablet and telephone in a sealed evidence bag and gave them to Homeland Security Investigations Task Force Officer Brian Hoopingarner, who took the items to Homeland Security Investigations's secured facility at the airport and then to the evidence room at Homeland Security Investigations's Atlanta headquarters to be stored. (Tr. 108, 112-13).

## II.  LEGAL ANALYSIS

Defendant moves to suppress the warrantless searches of his luggage, Galaxy tablet, and cellular telephone. Defendant argues that the searches of his luggage, tablet, and telephone were targeted warrantless searches that were not routine border searches and therefore violated his Fourth Amendment rights. Defendant further argues that the search of his telephone violated his Fifth Amendment right against self-incrimination because one of the CBP officers asked him for the pass code for his telephone before reading him his Miranda rights.

### A.  The Search of Defendant's Luggage and Tablet Were Valid Border Searches

The CBP officers' search of Defendant's luggage and tablet were valid border

searches that did not violate Defendant's Fourth Amendment rights. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. With few exceptions, warrantless searches are per se unreasonable. See Cady v. Dombrowski, 413 U.S. 433, 439 (1973). One of those exceptions is a search at our nation's borders: "Border searches, . . . from before the adoption of the Fourth Amendment, have been considered 'reasonable' by the single fact that the person or item in question [has] entered our country from outside." United States v. Ramsey, 431 U.S. 606, 619 (1977). "The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." Id. at 620. "At the border, an individual has a lesser expectation of privacy, the government has a greater interest in searching, and the balance between the interests of the government and the privacy right of the individual is struck more favorably to the government." United States v. Alfaro-Moncada, 607 F.3d 720, 728 (11th Cir. 2010). An airport is considered the functional equivalent of a border. See United States v. Richards, 638 F.2d 765, 771 (5th Cir. 1981).[4]

Border searches may be classified as routine or non-routine. "Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." United States v. Montoya de Hernandez, 473

---

[4] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

8

U.S. 531, 538 (1985); Alfaro-Moncada, 607 F.3d at 728. Routine searches can include subjecting a traveler to a pat-down search or frisk or inspecting a traveler's luggage, without any level of suspicion. See Alfaro-Moncada, 607 F.3d at 728. Routine searches include secondary customs searches that are conducted after an initial inspection. See United States v. Santiago, 837 F.2d 1545, 1548 (11th Cir. 1988); United States v. Masesa, 218 F. App'x 880, 882 (11th Cir. 2007). On the other hand, non-routine border searches, such as a strip search or x-ray examination of a person, involve a greater level of intrusion into a person's privacy and thus require reasonable suspicion. See Alfaro-Moncada, 607 F.3d 720 at 729 ("Even at the border, however, reasonable suspicion is required for highly instrusive searches of a person's body such as a strip search or an x-ray examination."); Masesa, 218 F. App'x at 882 ("However, a customs agent must have a reasonable suspicion before conducting a more intrusive, non-routine border search, such as an x-ray examination."). "When assessing reasonable suspicion, courts must 'look at the totality of the circumstances of each case to see whether the detaining [agent] has a particularized and objective basis for suspecting legal wrongdoing.'" United States v. Roberts, 357 F. App'x 226, 227 (11th Cir. 2009) (quoting United States v. Arvizu, 534 U.S. 266 (2002)). "'Though there must be an objective basis for suspected wrongdoing, officers substantively may assess the facts in light of their unique training, expertise, and experience in the field.'" Id. (quoting United States v. Tinoco, 304 F.3d 1088, 1116 (11th Cir. 2002)).

In this case, it is undisputed that Defendant landed at Hartsfield airport on a flight

originating from Costa Rica. Thus, Hartsfield airport served as a functional equivalent of a border. While Defendant was at the airport, CBP Officer Regas stopped him, took him to a secondary inspection area within the airport, and searched his bags. Upon searching Defendant's bags, Officer Regas discovered cocaine hidden in toiletry bottles within Defendant's bags. This warrantless search of Defendant's bags falls squarely within the parameters of a routine border search.

Defendant argues that the CBP officer's search of his luggage is invalid because customs agents were targeting him based on a lookout that was placed in the computer system for him by the Department of Homeland Security. Defendant submits that using the border search as pretext for a targeted search disqualifies the search from being deemed a routine border search. Considering the persuasive authority on this issue, this Court declines to adopt the position Defendant advocates. In United States v. Irving, 452 F.3d 110, 123 (2d. Cir. 2006), a case Defendant acknowledges in his brief, the Second Circuit reasoned that "in the case of searches at airports, it would make little sense to allow random searches of any incoming passenger without reasonable suspicion, but require reasonable suspicion for searches of passengers that are suspected of criminal activity. From this, we reason that the validity of a border search does not depend on whether it is prompted by a criminal investigative motive." Id. Similarly, a district court in this Circuit concluded that the validity of a border search "is unaffected by the fact that the search is prompted by other law enforcement agents or by an investigative motive." See United States v. Morgan, No. 8:09-cr-585-T-24TBM, 2011

10

WL 3035104, at *6-7 (M.D. Fla. June 20, 2011) (customs agents' search of defendants' luggage was not rendered an invalid border search simply because FBI agents advised customs agents of the charges pending against defendants and asked customs agents to be on the lookout for particular items of evidentiary value during their border search). Based on these cases and in light of the Government's overarching interest in controlling "who and what may enter the country," it stands to reason that if CBP Officer Regas could have searched Defendant's bags without any suspicion whatsoever, the fact that Officer Regas suspected Defendant may have been engaged in unlawful activity based on a lookout strengthens rather than undermines the validity of the border search. As a result, the search of Defendant's luggage in response to a lookout constitutes a valid, routine border search. See, e.g., United States v. Moreno, 778 F.2d 719, 721 (11th Cir. 1985) (warrantless search at the border resulting from a lookout placed on a list of vessels suspected of bringing articles into the United States without declaring them or having them inspected by Customs invoked no Fourth Amendment violations).

Likewise, the warrantless search of Defendant's Galaxy tablet after CBP Officer Regas discovered cocaine in Defendant's bags was a valid border search. Defendant argues that given the nature and amount of information that individuals can store on electronic devices, such as a tablet, the search of his tablet at the airport was so personally invasive that it constitutes a non-routine border search requiring reasonable suspicion. As an initial matter, Defendant does not direct this Court to any authority in which a court applied the heightened reasonable suspicion standard for non-routine

11

border searches to searches of property, such as a tablet.  Additionally, Defendant does not explain why the facts in this case fall short of demonstrating that CBP officers had reasonable suspicion to search his tablet.  Nevertheless, assuming arguendo that the search of Defendant's tablet required reasonable suspicion, the factual circumstances surrounding the search of Defendant's tablet meets this heightened requirement.  At the time CBP Officer Wolfe inspected Defendant's tablet, CBP Officer Regas had already discovered that Defendant was carrying cocaine in toiletry bottles in his luggage as well as a vacuum-sealed bag of more than $2,000 in fifty dollar bills.  Defendant told Officer Regas that he had packed his luggage himself and that no one asked him to carry anything inside his luggage.  Defendant also told Officer Regas that he had secured his luggage with zip-ties.  Therefore, at the time Officer Wolfe searched Defendant's tablet, CBP officers had a particularized and objective basis for suspecting that Defendant was engaged in illegal activity.  As the Government notes, electronic tablets share many of the capabilities of modern cellular telephones, and cellular telephones are known tools of the drug trade, see United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990).  Based on the above, this Court concludes that the search of Defendant's Galaxy tablet was a valid border search.  Accordingly, the undersigned **RECOMMENDS** that Defendant's request to suppress the evidence obtained as a result of the search of his luggage and Galaxy tablet be **DENIED**.

**B.**    **The Second Search of Defendant's Tablet Would Be a Valid Search**

The Government has indicated that it plans to review Defendant's tablet a second

time. At the evidentiary hearing before the undersigned, CBP Officer Wolfe was unable to specify whether the telephone numbers, contacts, recent calls, and email addresses on a log he created during his search came from Defendant's telephone or tablet. Defendant argues that the Government cannot perform an additional search of his tablet because such search would constitute an illegal extended border search. The Eleventh Circuit has "allowed searches [to be] conducted within the border even after the first practicable detention point where supported by reasonable suspicion." United States v. Garcia, 672 F.2d 1349, 1364 (11th Cir. 1982). These searches, referred to as extended border searches, "require reasonable certainty that a border crossing has occurred and that conditions have remained unchanged from the crossing until the search." Id. "Because searches so delayed may involve a greater invasion of privacy than searches at the border or first practicable detention point, . . . they may be conducted without a warrant only if supported by reasonable suspicion [of criminal activity]." Id.; see also Santiago, 837 F.2d at 1548 ("[A]n extended border search requires a reasonable suspicion of illegal activities.").

This Court agrees with Defendant that an additional search of his tablet by the Government would fall under the extended border search doctrine. However, Defendant does not explain how an additional search runs afoul of this doctrine. There is no question that Defendant crossed the border with his Galaxy tablet, and the tablet has been stored under the Government's lock and key since Defendant's return to the United States. Therefore, the condition of the tablet has remained unchanged since the device

13

was originally seized from Defendant at Hartsfield airport on July 1, 2012.  See United States v. Richards, 638 F.2d 765, 772 (5th Cir. 1981) (explaining that in order for the government to perform a valid, extended border search "it must be established with reasonable certainty that, when searched, the person or thing was in the same condition as when the border was crossed.").   Also, as explained above, the record clearly establishes that the Government has reasonable suspicion to conclude that Defendant was involved in illegal activity based on the cocaine and cash discovered in his luggage and that Defendant may have used his tablet as part of his efforts to smuggle narcotics into the United States.  For all practical purposes, there is no difference between the Government's additional review of Defendant's tablet now and CBP Officer Wolfe's initial search of Defendant's tablet at Hartsfield airport.  Accordingly, the undersigned **RECOMMENDS** that Defendant's request to suppress the additional search of his Galaxy tablet be **DENIED**, and that the Government be allowed to review the tablet to create a new list of telephone numbers, contacts, recent calls, and email addresses.

### C.   The Search of Defendant's Cellular Telephone Should Be Suppressed

Defendant moves to suppress the evidence obtained from the search of his cellular telephone because CBP Officer Wolfe asked him for his pass code to unlock the telephone prior to giving him the Miranda warnings. The Government concedes that the evidence obtained as a result of the search of Defendant's telephone should be suppressed and agrees not to use any such evidence against Defendant in its case-in-chief.  Accordingly, the undersigned **RECOMMENDS** that Defendant's request to

14

suppress such evidence be **GRANTED**.

## MOTION FOR RETURN OF PROPERTY

Defendant seeks the return of his tablet and cellular telephone because he contends that the continued seizure of these devices is unlawful. According to Defendant, no evidence has been presented that his telephone or tablet contain contraband of any kind and the Government has admitted it has not attempted to obtain a search warrant to examine these devices. In response, the Government asserts that in order for Defendant's property to be returned to him pursuant to Federal Rule of Criminal Procedure 41(g), he must demonstrate that he has a possessory interest in the seized property and that he has clean hands with respect to the property. Alternatively, the Government argues that it has a continuing need for Defendant's devices for evidentiary purposes.[5]

Federal Rule of Criminal Procedure 41(g) allows for "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property [to] move for the property's return." However, "trial courts have rejected motions for return of property when formal charges have been filed, since the appropriate vehicle for the resolution of those questions [is] a motion to suppress under Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure." United States v. Laughlin, No. 1:10-CR-113-

---

[5] Even though the Government concedes the evidence obtained from Defendant's cellular telephone should be suppressed, the Government advises that it needs to retain Defendant's telephone for possible impeachment purposes, rebuttal, and any other legally permissible uses should this case proceed to trial.

15

TWT/AJB, 2012 WL 3065404, at *18 (N.D. Ga. July 6, 2012). "Thus, . . ., if there is a pending criminal prosecution, courts should view Rule 41(g) motions as tied to a criminal prosecution governed by Rule 12." Id. Because the motion for return of property here is tied to the instant prosecution, the undersigned **RECOMMENDS** that Defendant's Motion for Return of Property be **DENIED**. See id. (denying motion for return of property that was tied to the instant prosecution).

## III.   CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence and Amended Motion to Suppress Evidence be **GRANTED IN PART AND DENIED IN PART**.   Docket Entries [38, 53]. Specifically, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence and Amended Motion to Suppress Evidence be **GRANTED** with respect to evidence obtained from the search of Defendant's cellular telephone and be **DENIED** with respect to evidence obtained from the search of Defendant's luggage and Galaxy tablet. The undersigned also **RECOMMENDS** that Defendant's Motion for Return of Property be **DENIED**.   Docket Entry [53]. The undersigned **DENIES AS MOOT** Defendant's Motion to Adopt Co-Defendant Tolbert's Reply to Government's First Response to Defendants' Motion to Suppress Evidence.  Docket Entry [46].

As there are no further motions pending, the undersigned certifies this case ready for trial. The Clerk is directed to terminate the reference to the undersigned.

16

**IT IS SO ORDERED AND REPORTED AND RECOMMENDED**, this  21

day of March, 2013.

s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

17